<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SUSAN Q. GREB, | |
| Plaintiff, | Civ. No. 02-3346 (GEB) |
| v. | |
| JOHN E. POTTER and UNITED STATES POSTAL SERVICE | **MEMORANDUM OPINION** |
| Defendants. | |

<u>**BROWN, District Judge**</u>

This matter comes before the Court upon Plaintiff's motion and Defendant's cross-motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). Having considered the parties' written submissions, and for the reasons discussed herein, Plaintiff's motion is denied and Defendant's cross-motion is granted.

**I.    BACKGROUND**

This action involves claims of unlawful discrimination based on gender, race and disability. Plaintiff Susan Q. Greb ("Plaintiff") brought suit against Defendants John E. Potter, the Postmaster General, and the United States Postal Service (collectively referred to as "Defendants") on July 12, 2002. In her Amended Complaint, Plaintiff alleges disability discrimination under § 501 of the Rehabilitation Act of 1973, 29 U.S.C.§ 791 ("the Rehabilitation Act"), and discrimination based on gender and race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq*. (Am. Compl. at 2-3). Plaintiff also claims that she was subjected to a discriminatory hostile work

environment and was constructively discharged from her position.

Plaintiff began employment with the United States Postal Service on June 26, 1982. Plaintiff suffered two work-related injuries which caused her to undergo shoulder surgeries. The Department of Labor found that she was fit to work eight hours a day in limited duty position. On May 25, 1999, Plaintiff was offered a rehabilitation job offer as a Modified Mark-up Clerk Automat which incorporated certain work restrictions based on her medical impairments. (Pl.'s Decl., Ex. 2). Her duties included, *inter alia*, working on mechanized and non-mechanized terminals which involved a certain degree of keying. Plaintiff accepted the rehabilitation job offer in July of 1999.

Plaintiff was assigned to the Computerized Mail Forwarding System ("CFS") Unit. The CFS Unit was created at Monmouth Processing and Distribution Center ("MPDC") in 1988. This unit performs mail-forwarding services for the Postal Service. The original supervisor of the CFS Unit was Robert Hoffman. In June of 1999, the CFS Unit added the position of manager who was responsible for supervising the employees, including the supervisor. Horace Bonaparte ("Bonaparte") assumed this position. Bonaparte was manager of the CFS Unit at MPDC between February of 1999 and March of 2002. Thereafter, the CFS Unit at MPDC closed and Bonaparte was transferred to the CFS Unit located in New Brunswick, New Jersey.

When Plaintiff began her position, she worked under the supervision of Robert Hoffman. In March of 2000, however, the unit divided into two tours – the morning and evenings tours. Bonaparte became the direct supervisor of the morning tour – the tour to which Plaintiff was assigned. Hoffman became supervisor of the evening tour, but remained under the overall supervision of Bonaparte. The managing style of Bonaparte and Hoffman greatly differed. Bonaparte began implementing different policies, rules and procedures. For example, Bonaparte

2

prohibited the use of cell phones at employees' work stations, and limited telephone calls by the employees. Employees were also prohibited from bringing handbags, large bags, food or drinks to their work area. Additionally, employees were required to inform Bonaparte whenever they needed to leave the work area, which included bathroom breaks. Many employees did not welcome the changes in the work environment. Some employees found the environment stressful or difficult. Other employees, however, recognized that Bonaparte's style of managing was a means of improving efficiency.

Although the working relationship between Plaintiff and her new supervisor, Bonaparte, began without difficulty, a poor relationship eventually developed between them. Between March and July of 2000, Plaintiff recorded various incidences when she felt that she was being harassed by Bonaparte. Plaintiff asserts that Bonaparte would threaten her with disciplinary action when she would not follow his orders. Plaintiff also asserts that she requested Bonaparte to call her "Mrs. Greb," but Bonaparte refused. Instead, she alleges that Bonaparte called her "Susan" (her first name) or would mock her by addressing her with variations of her last name.

With regard to Bonaparte's newly instituted policy of requiring all employees to inform him whenever they left the work room floor, Plaintiff claims that this policy only applied to females. Defendants dispute this contention. Plaintiff asserts that she felt uncomfortable with the concept of telling Bonaparte when she had to use the bathroom. In lieu of this phrase, Plaintiff claims she would inform Bonaparte that she needed to wash her hands. Plaintiff recorded one incident when she informed Bonaparte that she was going to wash her hands. In response, Bonaparte threw a pair of gloves on her desk. Plaintiff further claims that Bonaparte yelled at her while she was having a private conversation with her co-worker.

3

In April of 2000, Bonaparte received a threatening letter concerning the manner in which he treated women. Bonaparte forwarded the letter to the Postal Inspectors who asked him if he knew of any employees who were unhappy with him. Bonaparte identified Plaintiff and another employee of the CFS Unit. The Postal Inspectors subsequently questioned them. Plaintiff cites this incident, that is, the questioning by the Postal Inspectors, as another example of how she was harassed at work.

The series of negative exchanges between Plaintiff and Bonaparte culminated on July 18, 2000. On this day, Plaintiff reported to work and was waiting to receive her daily assignment from Bonaparte. Bonaparte initially assigned her to work on a mechanized terminal. Plaintiff then informed Bonaparte that she was not able to perform this task because she had a medical note. The note was dated June 26, 2000. Plaintiff failed to present the note to Bonaparte before this day. The note stated "Mrs. Greb is unable to perform keyboarding on the mechanized terminal for 3 months due to a neck injury." (Pl.'s Decl., Ex. 6). Bonaparte instructed Plaintiff to sit in a chair and to await further instructions. Bonaparte continued to give assignments to the remaining employees. Plaintiff remained seated in the chair for approximately an hour. During that time, she felt uncomfortable sitting in the chair without having received an assignment. Plaintiff felt that she was being humiliated. She began to experience chest pains and sought a union advocate. Eventually, a union advocate arrived to discuss the situation. Once Bonaparte was informed that Plaintiff was experiencing chest pains, he called for an ambulance. Plaintiff was subsequently transported to the hospital, and was discharged the same day.

Following this incident, Plaintiff requested that Bonaparte complete a form which states that Plaintiff suffered a traumatic injury on that day. Bonaparte refused to complete the form. Plaintiff

also requested a transfer to another facility. Her request was denied. Since July 18, 2000, Plaintiff has not returned to work because she contends she cannot work under the supervision of Bonaparte.

On November 23, 2004, Plaintiff moved for summary judgment on all claims raised in Plaintiff's Amended Complaint.[1] On December 13, 2004, Defendants filed opposition and cross-moved for summary judgment. Plaintiff filed her reply and opposition to the cross-motion on December 20, 2004. The Court notes that with the exception of some changes made to the preliminary statement, Plaintiff essentially resubmitted the same argument section of her moving papers, twenty-nine pages in total, as her responsive pleading. Thus, Plaintiff largely fails to respond to the arguments and defenses raised by Defendants in their cross-motion. A reply letter brief was submitted by Defendants on January 10, 2005. Oral argument was heard on January 18, 2005, at which time the parties informed the Court that they rely entirely on their briefs. Having considered all pleadings and the voluminous declarations and affidavits submitted by the parties, the Court will now address all of Plaintiff's claims.

## II.     DISCUSSION

### A.     Summary Judgment Standard

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Orson, Inc. v. Miramax Film*

---

[1] Plaintiff initially moved for summary judgment on August 25, 2004. Thereafter, Defendants cross-moved for summary judgment and moved to strike Plaintiff's Statement of Uncontested Facts. Oral argument was originally scheduled for October 29, 2004. However, the Court informed the parties that their submissions failed to comply with the Local Rules of this Court, and they were instructed to re-file their motions.

*Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996); *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1219, n.3 (3d Cir. 1988), *cert. denied*, 490 U.S. 1098 (1989); *Hersh v. Allen Prod. Co.*, 789 F.2d 230, 232 (3d Cir. 1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir. 1987).

Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

FED. R. CIV. P. 56(e). The rule does not increase or decrease a party's ultimate burden of proof on a claim. Rather, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 255-56.

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the nonmoving party has provided evidence

to show that a question of material fact remains. *See Celotex,* 477 U.S. at 324. Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented . . . by depositions, answers to interrogatories, or further affidavits," *id.* at 322, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Anderson*, 477 U.S. at 247-48 ("By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion . . . the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit."); *Anderson*, 477 U.S. at 249; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact . . . the [non- moving party] need not match, item for item, each piece of evidence proffered by the movant" but rather must exceed the 'mere scintilla' threshold.), *cert. denied*, 507 U.S. 912 (1993).

### B.        Plaintiff's Disability Discrimination Claim

Plaintiff brings her disability claim under the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq.*  Under this act, federal employers, such as the United States Postal Service, and employers who receive federal funding are prohibited from discriminating against individuals with disabilities in terms of hiring, placement or advancement.  *See* 29 U.S.C. 791(b); *Mengine v. Runyon*, 114 F.3d 415, 418 (3d Cir. 1997).  Generally, courts analyze Rehabilitation Act claims by using the same "standards applied under title I of the Americans with Disabilities Act of 1990 . . . ."  29 U.S.C. § 791(g).

In order to succeed on a disability discrimination claim under the Rehabilitation Act, the plaintiff must first make a "prima facie showing that reasonable accommodation is possible." *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996).  The plaintiff must demonstrate the following: "(1) that he or she has a disability; (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job." *Id.*  After the plaintiff satisfies this burden, the burden then shifts to the employer to prove the affirmative defense that the requested accommodation is either unreasonable or would impose an undue hardship. *Id.*

The first inquiry before this Court is whether Plaintiff is an individual with a "disability" as defined under the Rehabilitation Act.  A "disability" is an impairment, either physical or mental in nature, that substantially limits at least one major life activity of the individual. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002); *see also Kralik v. Durbin*, 130 F.3d 76, 78 (3d Cir. 1997) (citing 42 U.S.C. § 12102(2) and 29 U.S.C. § 706(26)); *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996); *McDonald v. Commonwealth of Pa., Dept. of Public Welfare, Polk Ctr.*, 62 F.3d

8

92, 95 (3d Cir. 1995). Major life activities refer to "those activities that are of central importance to daily life." *Toyota Motor Mfg.*, 534 U.S. at 197. Functions that involve "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working, . . . as well as sitting, standing, lifting and reaching" are deemed major life activities. *Kralik*, 130 F.3d at 78-79.

The Supreme Court articulated that the standard for qualifying as a disabled individual is a demanding one. *Toyota Motor Mfg.*, 534 U.S. at 197. The Court held that it is insufficient for an individual to attempt to prove disability by merely submitting evidence such as a medical diagnosis of an impairment. *Id.* Instead, the individual must demonstrate that he or she has an impairment "that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Id.* at 198. Moreover, the impact of the impairment must be permanent or long term. *Id.*

In the present case, the Court concludes that Plaintiff fails to make a prima facie case of disability discrimination. Specifically, Plaintiff fails to demonstrate that she is disabled for purposes of the Rehabilitation Act. Plaintiff relies upon the Rehabilitation Job Offer she received on May 25, 1999 to establish that she is disabled. (Pl.'s Br. at 12-13 ("[T]his Court is not caused to scrutinize Plaintiff's qualifications for disability. There is irrefutable proof at <u>Exhibit 2</u> of Plaintiff's Declaration that Susan Greb received a Rehabilitation Job Offer with permanent medical restrictions due to an accepted on the job injury [in] May . . . of 1999, which was accepted by her."); *see* Pl.'s Decl., Ex. 2). However, the job offer merely indicates that Plaintiff has medical restrictions which necessitate certain work limitations. The medical records show that Plaintiff underwent shoulder surgeries and continued to experience pain afterward. It was determined that her right upper

9

extremity was impaired by 21% and her left upper extremity by 19%. (Pl.'s Decl., Ex. 1). Additionally, Plaintiff offers conclusory statements that she is "substantially physically limited." (Pl.'s Decl., ¶ 12). Plaintiff contends that she has trouble caring for herself, bathing, dressing, reaching, lifting, sleeping and performing personal hygiene without assistance. (*Id.*).

This evidence is insufficient to establish that Plaintiff qualifies as an individual with a "disability" to invoke the rigors of the Rehabilitation Act. Although the evidence suggests that Plaintiff may have difficulty raising her arms beyond a certain point and that she is not able to key for more than four hours a day, Plaintiff fails to point to evidence demonstrating that these impairments are anything more than mild limitations. *See Kelly*, 94 F.3d at 106 (noting that impairments resulting only in moderate restrictions are not disabilities).

Furthermore, even if Plaintiff is "disabled" under the Rehabilitation Act, Plaintiff fails to show that she was terminated or otherwise prevented from doing her job. The evidence in the record demonstrates that on July 18, 2000, Plaintiff was initially instructed to key on the mechanized terminal. After Plaintiff informed Bonaparte of a medical note indicating that she was unable to perform this task, she was instructed not to work on the machine but to wait for further instructions. While waiting, Plaintiff experienced chest pains and was admitted to the hospital. Thereafter, Plaintiff did not return to work, apparently because she did not feel that she could work under the supervision of Bonaparte. These facts do not demonstrate that Plaintiff was prevented from doing her job because of her claimed disability. Instead, it demonstrates Plaintiff's decision not to return to work because of the adverse relationship she believed existed between herself and her supervisor.

Accordingly, the Court concludes that Plaintiff fails to meet her burden of making a prima facie case of disability discrimination under the Rehabilitation Act. Consequently, summary

judgment must be granted in favor of Defendants as to this claim.

### C. Plaintiff's Discrimination Claims Based on Gender and Race

Plaintiff also brings claims against Defendants for discrimination based on gender and race under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 *et seq*. Title VII makes it unlawful for an employer to discriminate "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Specifically, Plaintiff contends that Bonaparte, an African-American male, discriminated against her because she is a white female.

Discrimination claims brought under Title VII must be analyzed according to the burden-shifting framework which was set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later clarified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), and *St. Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993). The framework consists of three steps. First, the plaintiff must present sufficient evidence to support a prima facie case of discrimination. *Hicks*, 509 U.S. at 506. Once plaintiff establishes a prima facie case, the burden of production then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for their actions. *Hicks*, 509 U.S. at 507; *Burdine*, 450 U.S. at 254; *McDonnell Douglas*, 411 U.S. at 802. If the defendant satisfies this burden, the court must proceed to the third step. At this stage, the burden of production shifts back to the plaintiff who must come forward with admissible evidence showing that the defendant's articulated nondiscriminatory reasons were not the true reasons for the adverse action, but merely a "pretext for discrimination." *Hicks*, 509 U.S. at 507-08; *Burdine*, 450 U.S. at 253. Although the evidentiary burdens shift between the

plaintiff and the defendant, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

In order to establish a prima facie case of discrimination, the plaintiff must prove that: 1) she belongs to a protected class; 2) she was qualified for the position; 3) she suffered an adverse employment action; and 4) the adverse action occurred under circumstances that give rise to an inference of discrimination. *Burdine*, 450 U.S. at 253-54; *McDonnell Douglas*, 411 U.S. at 802.

In *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296-97 (3d Cir. 1997), the Third Circuit described the type of adverse employment decision that is actionable under Title VII. The adverse employment action must be "sufficiently severe as to alter the employee's 'compensation, terms, conditions, or privileges of employment,' or to 'deprive or tend to deprive [him or her] of employment opportunities or otherwise adversely affect his [or her] status as an employee.'" *Id.* (citing and quoting 42 U.S.C. § 2000e-2(a)(1) and (2)). The court articulated that not all workplace conduct that one may perceive as harassment qualifies as an actionable adverse employment action. *Id.* at 1297. Moreover, "not every insult, slight, or unpleasantness gives rise to a valid Title VII claim." *Id.* The Supreme Court further characterized a tangible employment action as one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753-54 & 761 (1998).

Here, Plaintiff fails to make a prima facie case of discrimination because she does not demonstrate that she suffered an adverse employment action. Plaintiff contends that she suffered

numerous adverse employment actions on specific dates.[2] (Pl.'s Br. at 22). Generally, these dates correspond to the following alleged incidences: 1) Bonaparte had a formal discussion with Plaintiff for not accepting overtime duty on March 5, 2000; 2) Plaintiff requested to speak with her union representative on several occasions, but Bonaparte did not immediately grant her request; 3) Bonaparte required Plaintiff to specify where she was going before taking a bathroom break; 4) while employees where waiting in the hallway to punch out for the day, Bonaparte allegedly singled out Plaintiff for improperly waiting; 5) Bonaparte refused to honor Plaintiff's request to address her as "Mrs. Greb"; 6) Plaintiff was questioned by Postal Inspectors after Bonaparte received a written threat; 7) Bonaparte threw gloves on Plaintiff's desk when she informed him that she had to wash her hands; 8) while Plaintiff was engaged in conversation with her co-worker, Bonaparte yelled at her; and 9) Plaintiff was instructed to sit in a chair for approximately an hour after informing Bonaparte that she could not work on a machine as indicated on her medical note. (*See* Pl.'s Decl., Exs. 9-16, 19).

      The Court finds that none of these incidences amount to an adverse employment action. Plaintiff does not contend that her employer's actions altered her compensation or terms of employment. Plaintiff does not allege that she was fired, demoted, suspended, or denied a promotion. Instead, Plaintiff has identified isolated, specific incidences that merely illustrate an alleged difficult relationship that existed between Plaintiff and Bonaparte. Such actions are not actionable under Title VII. Consequently, Defendant's motion for summary judgment as to Title VII

---

[2] Plaintiff states that she suffered adverse employment action on the following dates: 1) March 5, 2000; 2) March 23, 2000; 3) March 28, 2000; 4) April 7, 2000; 5) April 18, 2000; 6) April 19, 2000; 7) April 26, 2000; 8) May 2, 2000; 9) May 18, 2000; and 10) July 18, 2000. (Pl.'s Br. at 22).

claims must be granted and Plaintiff's claims be dismissed as a matter of law because she fails to meet her burden of making a prima facie case of employment discrimination.

### D. Plaintiff's Hostile Work Environment and Constructive Discharge Claims

#### i. Hostile Work Environment

Plaintiff further claims that she was subjected to a hostile work environment. In order to succeed on a claim for hostile work environment under Title VII, the plaintiff must demonstrate that "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21(1993) (citations and quotations omitted). The discrimination must be based on the plaintiff's race, gender, religion, or national origin. *Id.* The plaintiff must prove that the environment was both objectively and subjectively hostile or abusive. *Walton v. Mental Health Ass'n. of S.E. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999).

In assessing hostile work environment claims, the court must examine the totality of the circumstances. These circumstances include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23; *Walton*, 168 F.3d at 667.

Here, although Plaintiff may succeed in proving that she perceived the work environment to be hostile and abusive, Plaintiff fails to prove the requisite objective component of the inquiry. While Plaintiff may establish that her relationship with Bonaparte was generally poor, she fails to

14

assert facts that would allow a reasonable jury to conclude that Bonaparte harassed her specifically because of her race, her gender, or Plaintiff's claimed disability.

In the context of a hostile work environment based on gender, the Third Circuit noted that "pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment." *Andrews v. City of Phila.*, 895 F.2d 1469, 1485 (3d Cir. 1990). Notably, Plaintiff does not contend that Bonaparte used any derogatory or insulting terms toward her. Instead, Plaintiff complains that Bonaparte refused to call her "Mrs. Greb" as she requested, but rather "Susan" or mocking derivations of her name. The Court finds that these allegations, even if true, are insufficient to establish a hostile work environment.

Plaintiff also argues that Bonaparte discriminated against women by requiring them to request specific permission to use the bathroom and prohibiting them from bringing in handbags. (Am. Compl. ¶ 60). Plaintiff, however, fails to provide the Court with competent evidence that these policies were limited to women. (*See* Greb Tr. at 80:9-18 (relying on hearsay evidence that men were not required to report when they needed to use the bathroom); *see also* Gaines Tr. at 21:8-22:4 (speculating as to whether Bonaparte did not require men to report)). Rather, the record shows that all employees, male or female, were required to inform Bonaparte whenever they left the work room floor, and no one was allowed to bring handbags or cell phones to the machines.[3] (*See* Elovich Decl., Ex. MM at 68:6-15, 79:18-80:3; Busciano Decl. ¶¶ 7-8; Pascucci Decl. ¶ 3).

Lastly, Plaintiff makes the generalized allegation that Bonaparte discriminated against the

---

[3] The record shows that Bonaparte and Buscaino had an agreement wherein Buscaino was not required to report every time he had to use the bathroom because of the medication he was taking. (Buscaino Decl. ¶ 7).

15

female workers in the CFS Unit. Significantly, however, Plaintiff goes on to admit that Bonaparte did not discriminate against black females. (Pl.'s Statement of Uncontested Facts, ¶¶ 83, 103; *see also* Andrews Tr. at 104:15-20). This belies any assertion that Bonaparte specifically harbored discriminatory animus against women. Therefore, this argument is rejected. Accordingly, the Court concludes that Plaintiff fails to demonstrate that Bonaparte created a hostile work environment because of her gender.

Plaintiff further asserts that a hostile work environment existed because of her race and claimed disability. Again, Plaintiff's claim is unavailing. Plaintiff belies her own assertion that Bonaparte discriminated against white employees or disabled persons by admitting that Joe Buscaino, a white employee who also had limited duties because of medical conditions, received better treatment than her. (*See* Pl.'s Decl. ¶ 14). Plaintiff fails to identify any other evidence to substantiate her generalized assertions. Based on this glaring absence of evidence, the Court concludes that Plaintiff fails to meet her burden of proving that a hostile work environment was created because of her race or claimed disability.

Plaintiff also appears to rely on the incidences that took place between March and July of 2000 to support her hostile work environment claim. (*See infra* Part C). The alleged harassment that occurred between March and July of 2000 is not numerous or severe enough for a reasonable person to conclude that the working environment was abusive or hostile. For example, throwing gloves on a desk, not giving immediate permission to speak to a union representative, and reprimanding an employee for waiting in line before it was time to punch out lacks the severity or pervasiveness of conduct that creates a hostile work environment. This conclusion is further buttressed by Plaintiff's own admission that she "became exceedingly sensitive to the[] extremely harsh and volatile sessions

with Bonaparte." (Am. Compl. ¶ 29). Although Bonaparte's conduct may have been offensive to Plaintiff, this by itself cannot ripen into a Title VII violation. *See Walton*, 168 F.3d at 667 (noting that the employer's offensive behavior toward the plaintiff does not indicate that it was based on the plaintiff's disability). An evaluation of the circumstances as a whole fails to convince this Court that Bonaparte's alleged conduct meets the sufficiently severe or persuasive standard set forth in *Harris*.

Therefore, based on an examination of the evidence contained in the record, the Court concludes that Plaintiff has not asserted enough facts to justify a conclusion that Bonaparte discriminated against her because of her gender, race or claimed disability. Accordingly, summary judgment must be granted in favor of Defendants as to the hostile work environment claim.

### ii. Constructive Discharge

When analyzing a constructive discharge claim, the relevant inquiry is whether the "'conditions of discrimination' were so intolerable that a reasonable person would have resigned." *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 718-19 (3d Cir. 1997). The Third Circuit articulated factors the court should consider when making such an inquiry. *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159 (3d Cir. 1993). These factors include whether : 1) the plaintiff was threatened with discharge; 2) the employer suggested resignation or retirement; 3) the plaintiff was demoted, or her pay or benefits were reduced; 4) the plaintiff was involuntarily transferred to "a less desirable position"; 5) the plaintiff's responsibilities were altered; and 6) the plaintiff received unsatisfactory job evaluations. *Id.* at 1161. Moreover, the Third Circuit intimated that if a plaintiff fails to demonstrate a hostile work environment claim, the plaintiff will likewise fail to establish the necessary predicate for a constructive discharge claim. *See Konstantopoulos*, 112 F.3d at 718.

17

The Court concludes that Plaintiff fails to adduce sufficient evidence to show that a reasonable person would have resigned because the alleged discriminatory conduct was so intolerable. The crux of Plaintiff's constructive discharge claim appears to be that Defendants failed to grant her request to transfer to another facility – so that she would no longer be under the supervision of Bonaparte. Plaintiff, however, fails to provide either factual or legal support to establish that she was entitled to such a transfer. Instead of being threatened with discharge or encouraged to resign, the evidence shows that Plaintiff remained entitled to her position as Modified Mark-up Clerk Automat after the July 18, 2000 incident.[4] Significantly, it appears that the decision not to return to work was Plaintiff's own choosing, rather than Defendants. Plaintiff does not contend that her pay or benefits were reduced prior to her claimed constructive discharge, nor that she received unsatisfactory evaluations. Moreover, any contention that her responsibilities were altered correlate with the factual underpinning that she was on limited duty status. With regard to her claim that she was forced to sit in a chair for approximately an hour, rather than perform another task, the Court finds that this does not support Plaintiff's claim that she was constructively discharged from her position.

Accordingly, the Court concludes that there is no genuine issue of material fact with respect to Plaintiff's constructive discharge claim. Consequently, the Court grants summary judgment in favor of Defendants as to this issue.

---

[4] To the extent that Plaintiff contends that Bonaparte threatened to discharge her when she refused to have an unsupervised discussion with him, the Court concludes that this verbal reprimand does not reach the level of intolerability required to sustain a constructive discharge claim. (Am. Compl. ¶ 27).

### E.     Plaintiff's NJLAD Claims

Plaintiff appears to have also asserted claims under New Jersey Law Against Discrimination ("NJLAD") against Defendants. (Pl.'s Br. at 12, 34). However, Plaintiff has not advanced any arguments in support of such claims. Nonetheless, these claims will also be dismissed as a matter of law. Generally, claims brought under NJLAD are subject to the same standards that are applicable in a Title VII claim. *Schurr v. Resorts Int'l Hotel Inc.*, 196 F.3d 486, 498 (3d Cir. 1999). For the same reasons discussed above, Plaintiff fails to assert cognizable claims of discrimination based on age, gender and disability in violation of NJLAD. Accordingly, the Court grants summary judgment in favor of Defendants as to any NJLAD claims.

### F.     Plaintiff's Claim for Intentional Infliction of Emotional Distress

Both parties moved for summary judgment with respect to Plaintiff's claim for intentional infliction of emotional distress. During the hearing that was held on October 29, 2004, the Court granted summary judgment as to this issue in favor of Defendants. (*See* Order dated Oct. 29, 2004 at 1). Accordingly, Defendants' motion for summary judgment as to this issue is denied as moot.

**III.     CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is denied, and Defendant's cross-motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 is granted.  The Court dismisses Plaintiff's Amended Complaint in its entirety.  An appropriate form of order accompanies this Memorandum Opinion.


Dated:          June 8, 2005


                                                s/ Garrett E. Brown, Jr.
                                              GARRETT E. BROWN, JR., U.S.D.J.